## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

PEGGY O'NEILL and KELLY O'NEILL,

      Plaintiffs,

v.

COUNTRY MOTORS, II, INC. d/b/a
BOB'S BUICK GMC OF MILFORD and
EXETER FINANCE CORP.,

      Defendants.

Civil Action No.
3:15 - CV - 1069 (CSH)

**DECEMBER 15, 2015**

## RULING ON DEFENDANT COUNTRY MOTORS'S CONSENT MOTION TO SET ASIDE ENTRY OF DEFAULT AND PLAINTIFFS' MOTION TO AMEND COMPLAINT

**HAIGHT, Senior District Judge:**

### I.  INTRODUCTION

On July 13, 2015, plaintiffs Peggy O'Neill and Kelly O'Neill ("Plaintiffs") commenced this action against defendants Country Motors II, Inc. ("Country Motors") and Exeter Finance Corp. ("Exeter") (collectively "Defendants") relating to the purchase and sale of a motor vehicle, a 2012 Chrysler 200 LX (herein "Motor Vehicle" or "Chrysler").  Plaintiffs purchased the Motor Vehicle from Country Motors on or about July 24, 2014, pursuant to a retail installment sales contract ("Contract").  Included in their Complaint, Plaintiffs allege that Country Motors violated the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, the Credit Repair Organization Act, 15 U.S.C. § 1679, *et. seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.* ("CUTPA").  Plaintiffs also assert that Country Motors violated the Connecticut Retail Installment

1

Sales Finance Act ("RISFA"), Conn. Gen. Stat. § 36a-770, *et seq.,* so that the Contract is subject to rescission and/or revocation (due to fraudulent representations by Country Motors).

In addition, Plaintiffs allege that Exeter is liable as the assignee of the Contract and is thus subject to Plaintiffs' claims against Country Motors (except the TILA claim).   Plaintiffs also allege that Exeter violated RISFA, Conn. Gen. Stat. § 36a-770, *et seq.* and the Connecticut Creditor Collection Practices Act ("CCPA"), Conn. Gen. Stat. § 36a-645, *et seq.*  Moreover, Plaintiffs assert that Exeter violated Article 9 of the Uniform Commercial Code  by failing to provide Plaintiffs with proper notice following the repossession and resale of the vehicle.

On September 25, 2015, pursuant to Rule 55, Fed. R. Civ. P., Plaintiff filed a Motion for Default Entry against Country Motors for "failure to file a responsive pleading to Plaintiffs' Complaint within the time prescribed by the Federal Rules of Civil Procedure." Doc. 11.  The Clerk, as authorized and required by Rule 55(a), granted that motion because Country Motors "ha[d] failed to plead or otherwise defend," Fed. R. Civ. P. 55(a).  In fact, at that time, Country Motors had not yet appeared in the action.  Doc. 12.

Pending before the Court are two motions:  (1) Country Motors's motion to set aside the default entry [Doc. 14] and (2) the Plaintiffs' motion to amend the Complaint [Doc. 21].  First, with respect to the default, counsel for Country Motors asks the Court to set aside the default for "good cause," arguing that Country Motors's failure to appear was "not willful" and that Plaintiffs consent to the granting of this motion. Doc. 14, at 2.[1]  Second, Plaintiffs request to amend their Complaint, stating solely that "[t]his [proposed] amendment is being filed within the time parameter set forth

---

[1]  Defense counsel says in the text of her motion to set aside the default: "Counsel for the plaintiffs consents to the granting of this motion."  Doc. 14, at 2 (¶ A.6.).  The motion was filed on October 5, 2015; and  Plaintiffs' counsel has not expressed disagreement with this assertion.

in the Joint Rule 26(f) Report of the Parties' Planning Meeting."[2]  Doc. 21, at 1.  The Court resolves

both motions herein.

## II.  DISCUSSION

### A.  Country Motors's Motion to Set Aside Default

#### 1.  Standard to Set Aside Entry of Default - Fed. R. Civ. P. 55(c)

"A motion under Rule 55(c) to set aside an entry of default is addressed to the sound

discretion of the district judge." *State Farm Mut. Auto. Ins. Co. v. Cohan*, 409 F. App'x 453, 455 (2d

Cir. 2011) (quoting *Marziliano v. Heckler*, 728 F.2d 151, 156 (2d Cir.1984)).  "Because the trial

judge is the person most familiar with the circumstances of the case and is in the best position to

evaluate the good faith and credibility of the parties, a reviewing court will defer to his decision

unless it is clearly wrong." *State Farm*, 409 F. App'x at 455 (citations omitted).

Under Federal Rule of Civil Procedure 55(c), "[t]he court may set aside an entry of default

for good cause." Although the rule does not define "good cause," the Second Circuit has "advised

district courts to consider three factors in deciding a Rule 55(c) motion: (1) whether the default was

willful; (2) whether the moving party has presented a meritorious defense; and (3) whether setting

aside the default would prejudice the party for whom default was awarded." *State Farm*, 409 F.

App'x at 455 (citing *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir.1993)). *See also Pecarsky*

*v. Galaxiworld.com Ltd.*, 249 F.3d 167, 171 (2d Cir. 2001) ("When deciding whether to relieve a

party from default or default judgment, we consider the willfulness of the default, the existence of

---

[2]  In contravention to Local Rule 7(a), Plaintiffs have failed to submit a memorandum of law in support of their motion to amend the Complaint.  Counsel are advised that "[f]ailure to submit a memorandum may be deemed sufficient cause to deny the motion." D. Conn. L. Civ. R. 7(a)(1).

a meritorious defense, and the level of prejudice that the non-defaulting party may suffer should relief be granted.").

"Defaults are not favored, particularly when the case presents issues of fact, and doubts are to be resolved in favor of a trial on the merits." *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir.1981) (*per curiam* )(citing, *inter alia, Klapprott v. United States*, 335 U.S. 601, [615 ] (1949)). "While courts are entitled to enforce compliance with the time limits of the Rules by various means," default is viewed as an "extreme sanction," which should be treated as "a weapon of last, rather than first, resort." *Meehan*, 652 F.2d at 277 (citations omitted). *See also Enron Oil Corp.*, 10 F.3d at 96 ("because defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party").

## 2. <u>Analysis</u>

In analyzing a motion to set aside default, the Court may consider equitable factors such as "whether the failure to follow a rule of procedure was a mistake made in good faith and whether the entry of default would bring about a harsh or unfair result." *Enron Oil Corp.,* 10 F.3d at 96. With respect to the result, "good cause" and the criteria for setting aside a default "should be construed generously," as a "reflection of [the Second Circuit's] oft-stated preference for resolving disputes on the merits." *Id.* at 95-96 (citing, *inter alia, Meehan*, 652 F.2d at 277).

"A motion to vacate a default is subject to a less rigorous standard than [the 'excusable neglect' standard which] applies to a Rule 60(b) motion to vacate a default judgment." *Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir.1996) (citing *Meehan*, 652 F.2d at 276). *See*

4

*also State Farm*, 409 F. App'x at 456 (Second Circuit "analyzed [defendants'] claims under Rule 55(c)'s more forgiving standard for setting aside an administrative default")(emphasis added); *New York v. Green*, 420 F.3d 99, 109 (2d Cir. 2005) (Under Rule 55(c), "a default may be vacated for 'good cause shown,' a less rigorous standard than applies under Rule 60(b)."). When a district court has erroneously applied the more vigorous standard of Rule 60(b) to consider vacating a default, versus a default judgment, the Second Circuit has held that such an error "requires reversal." *Meehan*, 652 F.2d at 276.

Applying the three relevant factors supplied by the Second Circuit with respect to "good cause" in considering a Rule 55(c) motion, the Court first examines whether Country Motors's default was "willful" – *i.e.*, whether Country Motors's failure to appear and plead was motivated by "bad faith, or at least something more than mere negligence." *Am. Alliance Ins. Co., Ltd.*, 92 F.3d at 60.   Nicole C. Chomiak, counsel for  Country Motors, has asserted that "Country Motors'[s] failure to appear was not willful." Doc. 14, at 2.  She represents that she "was retained by Country Motors" and "immediately filed an appearance on behalf of Country Motors" the day after the default was entered.  *Id.*  Where there is no evidence that "bad faith" led to Country Motor's default, the Court finds no grounds to declare the default willful.

Second, "[t]o satisfy the criterion of a 'meritorious defense,' the defense need not be ultimately persuasive at this stage." *Am. Alliance Ins. Co., Ltd.*, 92 F.3d at 61. *See also State Farm*, 409 F. App'x at 456 ("[i]n order to make a sufficient showing of a meritorious defense in connection with a motion to set aside a default, the defendant need not establish his defense conclusively," but rather present facts that would constitute a defense). In the case at bar, Country Motors's newly retained counsel, Chomiak, is currently in the process of gathering sufficient facts to respond to the

Complaint. She presently asserts, however, that at a minimum her client will defend the case by denying the claims. Doc. 14, at 4. In addition, Chomiak participated in the Rule 26(f) Conference, albeit informally given her client's defaulted state, and declared in the Joint Rule 26(f) Report [Doc. 20] that "Country Motors denies any and all claims, including those for any and all damages, made by the Plaintiffs" and "further reserves its right to assert any and all defenses when it responds to the Complaint." Doc. 20, at 3. Country Motors clearly intends to defend in this action by denying that it violated any of the laws cited in Plaintiffs' claims and by preserving its right to raise various defenses. In the particular circumstances of this case – at a preliminary stage in the proceedings (*i.e.*, preceding substantial, if any, discovery) and where Plaintiffs consent to the motion to set aside default – the Court will construe the second prong liberally to allow Country Motors's denial of the claims to demonstrate that it will attempt to present a meritorious defense.[3]

Third, "[t]he final factor that a court must consider in determining whether to set aside a default is the potential that doing so would result in prejudice to the non-defaulting party." *State Farm*, 409 F. App'x at 456. In the case at bar, there will be minimal prejudice to Plaintiffs if Country Motors is allowed to participate in this action. Not only is the case in its early stages – with Plaintiffs' request to amend the Complaint pending – but Plaintiffs have apparently *consented* to the default being set aside. Doc. 14, at 2 (¶ A.6). It thus follows that there has been no showing that prejudice will result if the default is set aside.

Based on analysis of all three factors, the Court finds "good cause" to set aside entry of default against defendant Country Motors.

---

[3] The Court's narrow holding regarding a meritorious defense *in this case* should not be construed broadly to suggest that a simple denial of the claims asserted will generally suffice to fulfill the Second Circuit's second prong to set aside default.

**B.**   **Plaintiffs' Motion For Leave to Amend Complaint**

**1.**   **Standard to Amend Complaint - Fed. R. Civ. P. 15**

Plaintiffs have moved for leave to amend their Complaint, asserting that the "amendment is being filed within the time parameter set forth in the Joint Rule 26(f) Report of the Parties' Planning Meeting."  Doc. 21, at 1.  The parties have jointly stated on the case record that "[t]he Plaintiffs should be allowed until December 15, 2015, to file motions to join additional parties and to file motions to amend the pleadings."  Doc. 20, at 7.  In consequence, Plaintiffs have filed their motion in accordance with the parties' agreement regarding the permissible period to move to amend the pleadings.  The parties' agreement regarding time to file the motion does not, however, preclude the Court's application of Rule 15, Fed. R. Civ. P., to determine whether the particular proposed amendment will be permitted.

Pursuant to Rule 15(a)(1), "[a] party may amend its pleading once as a matter of course within:  (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Plaintiffs filed their Complaint in July 2015, more than twenty-one days before moving to amend in November 2015.  Also, defendant Exeter answered the Complaint on October 13, 2015 – twenty-three (23) days before Plaintiffs sought leave to amend on November 5, 2015.[4]  Doc. 18, 21.  Although "an answer to a complaint" is by definition a "pleading" under Federal Rule 7(a)(2) of Civil Procedure, Exeter's answer  was filed more than twenty-one days

---

[4]   The Court calculates the period of days in accordance with Federal Rule 6(a) of Civil Procedure.  Accordingly, the Court excludes the day of the event that triggers the period (file date for Answer, 10/13/2015), counts all intermediate days (including Saturdays and Sundays); and includes the last day of the period (file date for motion to amend, 11/5/2015).  *See* Fed. R. Civ. P. 6(a)(1)(A)-(C) (captioned "Computing and Extending Time; Time for Motion Papers").

before the motion to amend was filed. Plaintiffs' present motion to amend is therefore not governed by Rule 15(a)(1) so that the motion may not be granted as a "matter of course."

Pursuant to Rule 15(a)(2), Fed. R. Civ. P., if not permitted to amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave" and "[t]he court should freely give leave when justice so requires." No written consent has been provided by Exeter, the only defendant in the action at the time the motion to amend was filed. Therefore, the decision of whether to grant leave to amend is entrusted to the district court's discretion, as guided by the last sentence of Rule 15(a)(2), which instructs that justice be done.[5]

Specifically, "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) ("Leave to file an amended complaint 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), and should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

### 2.  Factual Allegations in Support of Claims

In reviewing the Plaintiffs' proposed Amended Complaint, the Court must analyze Plaintiffs'

---

[5] With respect to amendments other than those which may be made a matter of course, Rule 15(a)(2), Fed. R. Civ. P., provides in full:

(2) *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

factual allegations in support of its claims to determine whether justice requires that the Court give leave to amend or whether amendment would be improper or futile. Plaintiffs allege that prior to July 24, 2014, plaintiff Peggy O'Neill received telephone calls from a salesman named Walter Pettway of Country Motors. Doc. 21-1, ¶ 10. Pettway repeatedly informed Peggy that "he had a lot of good deals on automobiles and he convinced her to go to the dealership to look at cars." *Id.* On July 24, 2014, Peggy went to Country Motors's dealership to meet with Pettway and view the available cars for sale. *Id.*, ¶ 11. Plaintiff Kelly O'Neill arrived at the dealership later in the day. *Id.*

On July 24, 2014, Walter showed Peggy a used 2012 Chrysler 200 LX. *Id.*, ¶ 12. After allegedly detaining Plaintiffs at the dealership for approximately six hours, Pettway informed Peggy and Kelly of a sale price that "was good for that day only." *Id.*, ¶ 13. Plaintiffs assert that the time limit for the sale price was "a false and deceptive statement, because Country Motors and other dealerships routinely sell comparable vehicles for significantly less than the price that [this Motor] Vehicle was sold to Plaintiffs." *Id.*

Country Motors then "prepared and presented Plaintiffs with a retail installment sales contract ("Contract") for the purchase of the [Motor] Vehicle." *Id.*, ¶ 14. The Contract indicated a cash price of $17,200 even though the Chrysler had a NADA Retail [V]alue of approximately $14,575."[6] *Id.*, ¶¶ 15-16. Plaintiffs traded in their 2000 Dodge Intrepid towards the purchase of the

---

[6] The Court takes judicial notice that "NADA" stands for "National Automobile Dealers Association" in this context. According to an internet blog on automobiles and their sales, "[s]pokespeople for the 74-year-old NADA guide say their book is superior to the others because the NADA book is the official data guide issued strictly for dealer members of the National Automobile Dealers Association (NADA) trade group, and it has access to totally exclusive data, such as dealer retail sales, and it analyzes additional data from more than 500,000 various points of sale and other market data." *See* http://www.autoblog.com/2007/06/22/best-blue-book/ .

Chrysler and received a "trade-in allowance of $3,500," which was "significantly greater than the true value of the Dodge Intrepid, which was approximately $500." *Id.*, ¶¶ 17-18. In consequence, Country Motors allegedly "inflated" the purchase price of the Chrysler. *Id.*, ¶ 18. According to Plaintiffs, "[t]he retail installment [sales] contract contained an itemization of the amount financed that did not accurately reflect the true cost of the [Motor] Vehicle or the true allowance for the Dodge Intrepid." *Id.*, ¶ 19. Moreover, the Contract specified that "Plaintiffs made a cash downpayment [sic] of $500, even though Plaintiffs had paid only $100 at the time they signed the Contract." *Id.*, ¶ 20.

Country Motors then allegedly "advanced $400 to Plaintiffs to enable them to get a check in that amount to demonstrate payment in full of the down payment to [defendant] Exeter." *Id.*, ¶ 21. The "pick-up payments for the down payment were [allegedly] incorrectly included as part of the down payment" and "not included in the schedule of payments." *Id.*, ¶ 22. At the time of the sale, Kelly had an income of "less than $1,200 per month," *id.*, ¶ 23; and "Plaintiffs had housing rental expenses of $1,600 per month."[7] *Id.*, ¶ 24.

In the proposed Amended Complaint, Plaintiffs allege, upon "information and belief," that Country Motors submitted a credit application to Exeter that "falsely stated that Kelly was earning $1,833 per month in income and that their monthly housing rental expense was only $250."[8] *Id.*,

_____

[7] It is unclear what income, if any, Peggy may have had at the time of the sale. The original Complaint states that she had "income of $1,571 per month in pension and social security benefits." Doc. 1, ¶ 23. However, the proposed Amended Complaint removes this financial information completely, fully omitting paragraph 23.

[8] In the original Complaint, the Plaintiffs also alleged that Country Motors falsely stated on the credit application to Exeter that "Peggy was receiving $2,069 per month from pension and [S]ocial [S]ecurity benefits." Doc. 1, ¶ 26. It is not known why, but Plaintiffs deleted this information from the proposed Amended Complaint, leaving only the allegations of falsehood on

¶ 25.  Furthermore, Country Motors allegedly "provided Exeter with a false list of references containing names of individuals that Plaintiffs do not know." *Id.*, ¶ 26.  Country Motors allegedly "forged Plaintiffs' signatures to that reference list."  *Id*.  Country Motors then  "obtained approval from Exeter to accept assignment of the Contract."  *Id.*, ¶ 27.  Plaintiffs assert that Exeter's approval was "obtained based upon fraudulent and false credit information that was submitted to Exeter by Country Motors, the false references, and Country Motor's false statements regarding the value of the [Motor] Vehicle, the value of the trade-in, and the amount being paid as a down payment." *Id.*, ¶ 28.

Plaintiffs allege that "Exeter would not have approved the transaction if it knew of Plaintiffs' actual income and expenses."  *Id.*, ¶ 29.  "[O]n that basis, Plaintiffs allege that Country Motors submitted false credit information to Exeter," *id.,* which resulted in their approval "for a transaction that [Plaintiffs] could not afford," *id.*, ¶ 30.

 After the sale, Exeter sought verification from Peggy "that she had made a $500 [down] payment" and she admitted that she had "only paid $100 of the down payment at the time she signed the Contract."  *Id.*, ¶ 31.  According to Plaintiffs, Country Motors advanced $400 in cash to them, and Plaintiffs returned the money to Country Motors so that it "could falsely document [for] Exeter that the entire $500 deposit had been paid." *Id.*, ¶ 32.  Country Motors then failed to assign the title of or register the Chrysler to Plaintiffs until receiving Exeter's confirmation that it would purchase the retail installment sales contract, which occurred several weeks after July 24, 2014, the contract date.  *Id.*, ¶ 33.  Because of this delay in extending credit to Plaintiffs, there was a "significant

---

the application regarding Kelly O'Neill's income per month and the monthly rent for housing.  Doc. 21-1, ¶ 25.

understatement of the Annual Percentage Rate." *Id.*, ¶ 34.  After  Plaintiffs were ultimately unable to make the monthly payments for the Chrysler, it was repossessed by Exeter in early November 2014. *Id.*, ¶ 35.

Exeter allegedly failed to provide notice of the intended disposition of the Motor Vehicle as required by Conn. Gen. Stat. § 36a-785(d) and by Article 9 of the Uniform Commercial Code.  *Id.*, ¶ 36.  Afer disposing of the Motor Vehicle, Exeter allegedly sent Plaintiffs a notice dated January 16, 2015, captioned "Explanation of Calculation of Deficiency," in which Exeter "failed to state the gross proceeds of the sale, failed to credit the account for the fair market value of the vehicle, and improperly asserted entitlement to the costs of resale." *Id.,* ¶ 37.

### 3.    __Examination of Plaintiffs' Claims under *Foman*__

#### a.   __Claims Against Country Motors__

In accordance with  *Foman*, it is incumbent on the Court to consider the potential futility of the proposed amendments in making its Ruling herein.  In the proposed Amended Complaint [Doc. 21-1], the Court discerns only two changes Plaintiffs seeks to make to the original Complaint: (1) the removal of paragraph 23 from the original Complaint  (which alleges that, at the time of purchase, Peggy had income in the amount of  $1, 571 per month in pensions and social security payments)  and (2) the removal of the portion of paragraph 26 in the original Complaint that alleges that Country Motors included in its credit application the false statement that "Peggy O'Neill was receiving $2,069 per month from pension and social security benefits."  Plaintiffs provide no explanation for removal of these financial details from the Complaint so the Court has no basis to determine Plaintiffs' reasoning in excising these amounts.  Perhaps counsel for Plaintiffs is still

gathering and verifying the figures regarding Peggy's monthly pension and Social Security income. At this preliminary stage of the proceedings, such financial details may be ascertained during discovery.[9]   At this juncture, the Court refrains from deciding whether *vel non* the absence of these particular financial details will help or impede success on Plaintiffs' claim.   Rather, the Court will examine each count in the proposed Amended Complaint (without plaintiff Peggy O'Neill's specific monthly income) to determine whether, as stated, it sets forth  a facially plausible claim for relief. If so, leave to file the proposed Amendment Complaint will not be futile and the action may proceed.

At the outset, applying the *Foman* standard to the case at hand, the Court finds that there is no evidence that the proposed Amended Complaint is the product of any undue delay or bad faith. Also, because this case remains in its early stages and Exeter has not objected, there is no evidence that there will be any undue prejudice to Exeter or to Colony Motors if amendment of the Complaint is allowed at this time.

Next, as set forth *supra*, the Court examines the prospect of futility with respect to the claims, as set forth in the proposed Amended Complaint. Although leave to amend must be freely given under ordinary circumstances, denial is proper where the proposed amendment would be "futile." *Foman*, 371 U.S. at 182.   An amendment  is  considered  "futile" if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir.1979); *Freeman v. Marine Midland Bank–New York*, 494 F.2d 1334, 1338 (2d Cir.1974).   *See also  Wilson-Richardson v. Regional  Transit  Serv.,  Inc.*, 948 F.Supp.2d 300, 306 (W.D.N.Y. 2013) ("I conclude that no

---

[9]  The Court notes that Defendants have not objected to the proposed Amended Complaint.

amendment of the complaint would be sufficient to salvage claims which are undisputedly unexhausted and untimely, and/or over which the Court lacks jurisdiction"). For example, a proposed amendment would be futile if it destroyed the Court's subject matter jurisdiction, asserted claims which are time-barred by the relevant statutes of limitation, or failed to state a claim.

In evaluating potential futility of the proposed amendments, the Court notes at the outset that in both the original and amended complaints, the Court has "federal question" subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because there are claims arising under federal statutes, such as the Truth in Lending Act and the Credit Repair Organization Act. Furthermore, the Court may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367. Moreover, even the shortest relevant statutes of limitation – *one year* for claims arising under the Truth in Lending Act and under the Creditors' Collection Practices Act, Conn. Gen. Stat. § 36a-648 (d) – were met when Plaintiffs filed their action within one year following the occurrence of the alleged violation. Because the transaction at issue was consummated on July 24, 2014, all causes of action appear facially timely.[10]

Having resolved that the Court has subject matter jurisdiction and the claims appear timely, the Court will examine whether the proposed Amended Complaint fails to state any facially plausible

_____

[10]   *See, e.g.*, Credit Repair Organization Act, 15 U.S.C. § 1679i (5-year limitation period commencing on date of violation); CUTPA, 42 Conn. Gen. Stat. § 42-110g(f) (3-year statute of limitations); breach of contract, Conn. Gen. Stat. § 52-576(a) ("[n]o action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues...."). *See also  Hales v. HSBC Bank U.S.A., N.A.*, 347 F. App'x 698, 699 (2d Cir. 2009) (applying three-year statute of limitations for violation of Article 9 of the U.C.C. – for "an action to recover upon a liability, penalty, or forfeiture created or imposed by statute.") (quoting *Banca Commerciale Italiana v. N. Trust Int'l Banking Corp.*, 160 F.3d 90, 93-94 (2d Cir.1998)).

claims.

### 1.      Truth In Lending Act

Plaintiffs first assert that Country Motors violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq*.  "The primary purpose of TILA is to promote the informed use of credit."[11] *Frazee v. Seaview Toyota Pontiac*, Inc., 695 F. Supp. 1406, 1407-08 (D. Conn. 1988) (citing 15 U.S.C. § 1601). Specifically, Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).  *See, e.g.*, *Aubin v. Residential Funding Co., LLC*, 565 F. Supp. 2d 392, 394-95 (D. Conn. 2008).  The Act thus "requires creditors to disclose credit terms in a uniform manner" and include "all additional mandatory charges imposed by the creditor . . . in the computation of the finance charge."  *Frazee,* 695 F. Supp at 1407-08 (citing *Mourning v. Family Publications Serv.*, 411 U.S. 356, 364 (1972)).  Furthermore, "[s]ince TILA is a remedial statute, it is interpreted strictly in favor of the consumer."  695 F. Supp. at 1408.

In the case at bar, Plaintiffs assert that Country Motors violated TILA by failing to accurately

---

[11]  The TILA explicitly states that "Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit." 15 U.S.C.A. § 1601.  The statute then continues:

> The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601.

calculate the amount of their loan so that Plaintiffs were unable to determine whether they could responsibly purchase the Motor Vehicle. In particular, Country Motors allegedly took the following actions which were violative of TILA: (1) failure "to include the deferred $400 within the schedule of payments" and false inclusion of the $400 as part of the down payment," Doc. 21-1, ¶ 39; (2) "overstatement of the Annual Percentage Rate" due to "failure to assign title of the [Motor] Vehicle to Plaintiffs and . . . failure to register the Vehicle to them at the time of sale," *id.*, ¶ 40; and (3) failure to "accurately itemiz[e] the amount financed in that [Country Motors] added the amount over-allowed on Plaintiffs' trade-in vehicle to the purchase price of the [Motor] Vehicle," *id.*, ¶ 41. Plaintiff states that each of these alleged violations caused them to suffer damages "because they did not realize that the purchase price of the [Motor] Vehicle was increased on account of the over-allowance on the trade-in," *id.,* ¶ 42. In other words, Country Motors's alleged failure to provide Plaintiffs with the accurate terms of the loan to buy the Motor Vehicle prevented Plaintiffs from knowing the actual amount financed.

I find that the allegations presented by Plaintiffs state a plausible claim to relief for violation of TILA under the requisite test set forth by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 566 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard creates a "two-pronged approach," *Iqbal*, 556 U.S. at 679, based on "[t]wo working principles." *Id*. at 678.

First, although a complaint need not include detailed factual allegations, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine

whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  Accepting Plaintiffs' well-pleaded allegations regarding the conduct of Country Motors in compiling the credit application to Exeter, I find that there are sufficient facts to allow the "Truth in Lending Act" claim to proceed as facially "plausible."

## 2. **Credit Repair Organization Act**

Plaintiffs next assert that Country Motors "violated 15 U.S.C. § 1679b(a)(1), which prohibits any person from making any statement that is untrue or misleading with respect to any consumer's credit worthiness, credit standing, or credit capacity to any person to whom the consumer has applied or is applying for an extension of credit."[12]  Doc. 21-1, ¶ 45. The Amended Complaint is rife with

---

[12]  The Credit Repair Organization Act provides in relevant part:

No person may–

(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to–

(A) any consumer reporting agency (as defined in section 1681a(f) of this title); or

(B) any person –
(i) who has extended credit to the consumer; or
(ii)  to whom the consumer has applied or is applying for an extension of credit . . . .

15 U.S.C. § 1679b.

allegations of untrue and/or misleading assertions that Country Motors made when submitting Plaintiffs' credit application to Exeter.  All of these false assertions impacted Plaintiffs' credit worthiness, standing, and/or capacity with respect to their credit application regarding the purchase of the Chrysler.  For example, Plaintiffs allege that the amount of Kelly's monthly income was misrepresented to Exeter as $1,833 per month when it was really $1,200 per month,  Doc. 21-1, ¶¶ 23, 25; Country Motors misrepresented to Exeter the amount of down payment the Plaintiffs paid as $500 when it was really $100, *id.*, ¶ 31 ; and Country Motors supplied a false list of references for Plaintiffs to Exeter, *id.*, ¶ 26.  Such facts alleged by Plaintiffs, especially County Motors's allegedly purposeful inaccuracies in Plaintiffs' credit application,  are sufficient to state a "plausible claim to relief" under the Credit Repair Organization Act pursuant to *Iqbal*.

### 3. **Violation of the Connecticut Unfair Trade Practices Act ("CUTPA")**

In their third claim, Plaintiffs state that Country Motors failed to assign title and to register the Chrysler to Plaintiffs at the time of sale.  Plaintiffs allege that  these  failures violated  Conn. Gen. Stat. § 14-62,  constituting a *per se* violation of  CUTPA  pursuant to Conn. Agency Reg. § 42-110b-28(b)(23).[13]  Doc. 21-1, ¶ 48.

---

[13] Section  42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides:

"It shall be an unfair or deceptive act or practice for a new car dealer or a used car dealer to violate any provision of a federal or state statute or regulation concerning the sale or lease of motor vehicles."

Conn. Agency Reg. § 42-110b-28(b)(23).  *See, e.g.,  Tirado v. Ofstein*, No. HHDCV054014648S, 2008 WL 902506, at *16 (Conn. Super. Ct. Mar. 14, 2008) (where defendant car dealer had violated TILA and RISFA, the court found that the defendant had "engaged in unfair and deceptive acts in commerce or trade in connection with this transaction in violation of CUTPA").

Plaintiffs further allege that "Country Motors' conduct, as aforedescribed [sic], was unfair and deceptive and in violation of CUTPA, in that it has engaged in a predatory sale of a vehicle to consumers who could not afford payment, and it has facilitated this transaction through credit application fraud and forgery." *Id.,* ¶49.  In consequence, "Plaintiffs have [allegedly] suffered an ascertainable loss of money or property in that they have lost their $500 downpayment, they have lost their trade-in vehicle, and their credit has suffered significant harm."  *Id.,* ¶ 50.

Under CUTPA, Conn. Gen. Stat. § 14-62, "[e]ach sale [of a motor vehicle] shall be evidenced by an order properly signed by both the buyer and seller, a copy of which shall be furnished to the buyer when executed, and an invoice upon delivery of the motor vehicle," both of which shall contain, *inter alia*, the make of the vehicle, year of the model, the amount of the deposit, and the cash selling price.  Conn. Gen. Stat. § 14-62(a).  Furthermore, under this provision of CUTPA, "[n]o dealer licensed under the provisions of section 14-52 shall sell any used motor vehicle without furnishing to the buyer, at the time of sale, a valid certificate of title . . ."  *Id.*, § 14-62(d).

It is clear from these provisions alone that, at the very least, Plaintiffs have alleged facts sufficient to support a CUTPA violation for Country Motors's failure to furnish a correct invoice and valid certificate of title for the Chrysler at the time of sale. There is no need for further analysis of additional CUTPA violations at this time in that Plaintiffs have alleged  a facially plausible CUTPA claim on multiple grounds, including, *inter alia*, violation of TILA.  *See, e.g., Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 105 (1992) (plaintiff's violation of TILA "constituted a violation of CUTPA").

#### 4. <u>Revocation of Acceptance or Rescission of Contract</u>

Finally as to Country Motors, Plaintiffs allege that said dealership "violated [the Retail Installment Sales Financing Act] RISFA by its violations of TILA," which entitles Plaintiffs to "a rescission of the Contract and to a return of the amounts paid for the [Motor] Vehicle, and to an order that no deficiency is owing." Doc. 21-1, ¶ 55. Alternatively, Plaintiffs allege that they are entitled "to revoke acceptance of the Motor Vehicle pursuant to Conn. Gen. Stat. § 42a-2-721 due to fraud and material misrepresentation by Country Motors." *Id.*, ¶ 56.

Plaintiffs have alleged that the contract for purchase of the Chrysler was a retail installment sales contract under the provisions of Connecticut's Retail Installment Sales Finance Act ("RISFA"), Conn. Gen. Stat. § 36a-770. Moreover, with respect to rescission, Plaintiffs allege that Country Motors has violated TILA, which also constitutes violation of RISFA.[14]   *See, e.g., Sterling v. Farran & Ezedine, LLC*, No. 3:10 CV 1119 WWE, 2011 WL 219697, at *3 (D. Conn. Jan. 20, 2011) ("A violation of TILA also constitutes a violation of RISFA.") (citing *Tirado v. Ofstein*, 2008 Conn. Super. LEXIS 667, at *38, 2008 WL 4416098 (Conn. Super. Ct. Mar. 14, 2008)). Under RISFA, a seller is required "to return the buyer's purchase price in toto when he has delivered nonconforming goods under circumstances that afford a buyer a right to reject or to revoke acceptance." *Barco Auto Leasing Corp. v. House*, 202 Conn. 106, 115 (1987).

Pursuant to Conn. Gen. Stat. § 36a-771 of RISFA, "[e]very retail installment contract shall be in writing, shall contain all the agreements of the parties and shall be completed as to all essential

---

[14]  For example, Plaintiffs alleged that "Country Motors violated TILA by failing to include the deferred $400 within the schedule of payments and by falsely including it as part of the down payment." Doc. 21-1, ¶ 39. Country Motors also allegedly misstated the Annual Percentage Rate and failed to accurately itemize the amount financed by adding an excessive ("over-allowed") amount on Plaintiffs' trade-in vehicle. *Id.,* ¶¶ 40-41.

provisions prior to the signing of the contract by the retail buyer."  Moreover, § 36a-771 provides that "[e]very retail installment contract for the purchase of consumer goods subject to section 36a-774 and this section shall set forth the information required to be disclosed under sections 36a-675 to 36a-685, inclusive . . ." (*e.g.*, correct annual percentage rate or finance charge).

If, as Plaintiffs allege, the Contract failed to contain the requisite key provisions, there may have been a violation of both TILA and RISFA   A proper remedy for violation of  RISFA includes rescission. Under the UCC, "[r]escission is utilized as a term of art to refer to a mutual agreement to discharge contractual duties," for example when one party has materially breached the terms of the contract, "cancellation for breach and avoidance on the grounds of infancy or fraud." Black's Law Dictionary (10th ed. 2014.)  If the important terms of the Contract were fraudulent or purposefully omitted, Plaintiffs have alleged a plausible claim for rescission.

As to the possibility of revocation, Plaintiffs' claim is less clear.  The Uniform Commercial Code regarding sales  is the law of the state of Connecticut and provides a buyer with the right to revoke acceptance of  non-conforming goods.   Under the UCC, in Connecticut, when a buyer justifiably revokes acceptance, he may cancel the contract and recover so much of the purchase price as has been paid.  Conn. Gen. Stat. § 42a-2-711(1).  However, to justify revocation in Connecticut the buyer must, pursuant to Conn. Gen. Stat. § 42a-2-608, prove one of  following conditions: (1) a nonconformity which substantially impairs the value to the buyer; (2) acceptance (a) with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured, or (b) without discovery of the defect, when the acceptance is reasonably induced by the difficulty of discovery or the seller's assurances; (3) revocation within a reasonable time after a nonconformity was discovered or should have been discovered; and (4) revocation before any substantial change

occurs in the condition of the goods which is not caused by their own defects.  *See, e.g., Conte v. Dwan Lincoln Mercury, Inc.*, 172 Conn. 112, 120-21 (1976).  "Revocation of acceptance is possible only where the non-conformity substantially impairs the value of the goods to the buyer."  *Conte*, 172 Conn. at 120-21.   For this purpose the test is not what the seller had reason to know at the time of contracting, but rather "whether the non-conformity is such as will in fact cause a substantial impairment of value to the buyer though the seller had no advance knowledge as to the buyer's particular circumstances." *Id.* at 121 (citing Uniform Commercial Code § 2-608, comment).

In the case at bar, there is no allegation that the Chrysler was "defective" or otherwise possessed a "nonconformity" that caused a substantial impairment of value to the buyers.  Rather, the problems Plaintiffs have alleged  relate solely to the financial terms of the purchase.  Under the facts presented, there does not appear to be a plausible "revocation claim."  The Court need not decide definitively whether this count fails to state a revocation claim for purposes of futility, however, because, as set forth *supra*, there are other claims against Country Motors, including possible rescission, that this Court finds facially plausible under *Iqbal*.[15]

**b.   Claims Against Exeter**

**1.   Assignee under Contract**

Turning to the claims against defendant Exeter for analysis under *Foman*, Plaintiffs first allege that Country Motors assigned the retail installment sales contract to Exeter and thus Exeter "is subject to Plaintiffs' claims against Country Motors (excluding the claim under the TILA)." Doc.

---

[15]  Plaintiffs are urged to revisit the potential viability, or lack thereof, of their revocation claim prior to filing their proposed Amended Complaint.  Failure to remove any causes of action which fail to state a claim may result in time-consuming, costly Rule 12(b)(6) motion practice.

21-1.  "A split of authority has developed in the Connecticut Superior Courts regarding whether an assignee is liable for the conduct of an assignor." *Deutsche Bank Nat. Trust Co. v. Medina*, No. FSTCV085006907S, 2011 WL 383943, at *5 (Conn. Super. Ct. Jan. 10, 2011).  "[A]n assignee of a contract takes it subject to all defenses which might have been asserted against the assignor"; but "does not take it subject to affirmative claims against the assignor arising from the assignor's prior conduct without express assumption of such liability by the assignee." *City of Hartford v. McKeever*, 139 Conn. App. 277, 286 (2012)(quoting *Fairfield Credit Corp. v. Donnelly*, 158 Conn. 543, 548 (1969)).[16]

The Connecticut Appellate Court "has recognized that although 'an assignee generally does not assume the original responsibilities of the assignor, [it] may be liable . . . for [its] failure to perform obligations of the assignor which [it] has assumed.'" *Brett Stone Painting & Maint., LLC v. New England Bank*, 143 Conn. App. 671, 689-90 (2013) (quoting *Hartford v. McKeever,* 139 Conn.App. at 285).  *See also* 6A C.J.S. 513, Assignments § 118 (2004) (obligations of assignor "are imposed on the assignee where he or she assumes them"). Put simply, "where it is clearly the intent of the parties, the assignee also succeeds to the obligations of the contract." *Id.*, at § 94, p. 485.

It is unclear in the allegations of Plaintiffs' Amended Complaint whether Exeter expressly assumed liability for Country Motors's prior conduct under the Contract.  The allegations suggest that Country Motors may have actually misled Exeter regarding County Motors's  performance in creating the Contract.  *See, e.g.*, Doc. 21-1, ¶¶ 27-29 (Exeter's approval "to accept assignment of the Contract . . . was obtained based upon fraudulent and false credit information that was submitted to

---

[16]  *Aff'd*  (with criticisms), 314 Conn. 255 (2014).

Exeter by Country Motors," including "false references," "false statements regarding the value of the [Motor] Vehicle, the value of the trade-in, and the amount being paid as a down payment.");  *id.*, ¶ 32 ("Country Motors advanced $400 cash to Plaintiffs, which they in turn repaid to Country Motors, so that Country Motors could falsely document to Exeter that the entire $500 deposit had been paid.").  If, for example,  Exeter was misled or induced by fraud into accepting assignment of the Contract, Exeter may have a defense against liability under the Contract.  However, if Exeter made a sweeping assumption of the Contract and all liability thereunder, and if Country Motors is liable to Plaintiffs, Plaintiffs may have a plausible claim under the theory of assignment.  At this point, this claim appears inadequately pled in that it lacks the key element of an express assumption by Exeter of Country Motors's obligations and liability under the Contract.[17]

### 2.   RISFA

Due to Exeter's failure to comply with the "Foreclosure" provisions of RISFA, set forth at Conn. Gen. Stat. § 36a-785, Plaintiffs claim they are "entitled to 25% of the amount paid under the Contract, or $1,000, plus an order that there is no deficiency owed by them."  Doc. 21-1, ¶ 61.  In the "Factual Allegations" section of the Amended Complaint, Plaintiffs assert that Exeter repossessed the Chrysler and "Plaintiffs did not receive a notice of intended disposition of the [Motor] Vehicle from Exeter." *Id.*, ¶¶ 35-36.   "[O]n that basis, [Plaintiffs] allege that Exeter did not provide them with a notice of intended disposition to the Plaintiffs as required by Conn. Gen. Stat. § 36a-785(d) . . . ." *Id.,* ¶¶ 35-36.

Section 36a-785(b) of RISFA provides that the holder of a retail installment sales finance

---

[17] *See* n. 15, *supra* (noting that Plaintiffs may wish to reconsider filing a potentially non-viable claim to avoid having to oppose a Rule 12(b)(6) motion).

contract, in this case Exeter, may serve upon the retail buyers, personally or by registered or certified mail, a notice of intention to retake the goods on account of the buyer's default.  Although notice is not a mandatory requirement, if the holder elects to send notice, it must be  served "[n]ot less than ten days prior to the retaking" of the goods, in this case the Vehicle. [18] *See, e.g., Hunter v. Am. Honda Fin. Corp*., No. CV 99 0587409, 2000 WL 422195, at *1 (Conn. Super. Ct. Apr. 4, 2000).

In the case at bar, Plaintiffs allege that they did not receive a notice of intended disposition of the Motor Vehicle until *after* its disposition.  Doc. 21-1, ¶¶ 36-37.  Specifically, "[f]ollowing the disposition of the Vehicle, Exeter sent Plaintiffs a written notice dated January 16, 2015 captioned 'Explanation of Calculation of Deficiency' in which it failed to state the gross proceeds of the sale, failed to credit the account for the fair market value of the vehicle, and improperly asserted entitlement to the costs of resale." *Id.*, ¶ 37.  Such a failure to account for the proceeds of the sale of the goods (*i.e.,* the Chrysler) is also a violation of the statute.  *See* Conn. Gen. Stat. § 36a-785(e) (mandating that "[w]ithin thirty days of the resale" the contract holder provide the retail buyer with a "written statement itemizing the disposition of the proceeds").  Under the circumstances alleged – where Plaintiffs assert that they were neither informed of Exeter's intent to repossess nor later received written itemization of the disposition of the resale proceeds – Plaintiffs have stated a facially plausible claim for relief under various provisions of RISFA

### 3.    CCPA Claim and UCC Claim

In the final counts of Plaintiffs' complaint, they assert, respectively, that (1) Exeter's January

---

[18]   Pursuant to RISFA, Conn. Gen. Stat. § 36a-785, the notice of the contract holder's intention to repossess "shall state the default and the period at the end of which such goods will be retaken, and shall briefly and clearly state what the retail buyer's rights under this subsection will be in case such goods are retaken."

16, 2015 notice contained false statements regarding the amount of any deficiency that could be claimed against Plaintiffs under the Connecticut Creditor Collection Practices Act ("CCPA"), Conn. Gen. Stat. § 36a-648; and (2) Exeter failed to comply with post-repossession notice of disposition of collateral requirements under Article 9 of the UCC, entitling Plaintiffs to monetary damages. Doc. 21-1, ¶¶ 63-64, 66.

Under § 36a-648 of the CCPA, a creditor may not use any "abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect a debt in violation" of the Act's provision or else "shall be liable to a person who is harmed by such conduct." The statutory award in damages includes (1) "actual damages sustained, (2) "if such person is an individual, additional damages as the court may award, not to exceed one thousand dollars," and (3) "in the case of any successful action to enforce liability" under the CCPA, "costs of the action and, in the discretion of the court, a reasonable attorney's fee."  Conn. Gen. Stat. § 36a-648 (a).

Plaintiff has alleged that the Chrysler was repossessed and sold without proper accounting by Exeter, which in essence may have resulted in a fraudulent practice to collect the debt Plaintiffs owed on the sales contract.   Construing the facts in a manner most favorable to Plaintiffs, they have alleged sufficient facts to support a facially plausible CCPA claim.

Finally, with respect to Article 9 of the UCC, Plaintiffs assert that Exeter is liable to the Plaintiffs for failure to comply with the post-repossession notice of disposition of collateral requirements under Article 9 of the UCC, Conn. Gen. Stat. § 42a-9-101, *et seq.*  Doc. 21-1, ¶ 66. With respect to damages, Plaintiffs allege that "Exeter is liable to Plaintiff[s] for the finance charge of $9,245.30 plus 10% of the $15,098.62 amount financed, for a total of $10,755.16." *Id*.

Article 9 of the UCC provides that "a secured party shall apply or pay over for application

26

the cash proceeds of disposition under section 42a-9-610" in a specified manner.  Conn. Gen. Stat. § 42a-9-615(a).  Moreover, "Section 9-616 requires a secured party in a consumer-goods transaction to provide a debtor with a notification of how it calculated a deficiency at the time it first undertakes to collect a deficiency."  Conn. Gen. Stat. § 42a-9-101.  If such provisions are not followed, as Plaintiffs have alleged, and "the collateral is consumer goods," the injured party or "debtor" "may recover for [the secured party's]  failure in . . . an amount not less than the credit service charge plus ten per cent of the principal amount of the obligation or the time-price differential plus ten per cent of the cash price."  Conn. Gen. Stat. § 42a-9-625(c)(2)

In the case at bar, as set forth *supra*, Plaintiffs have pled facts indicating that Exeter failed to comply with the post-possession notice requirements of Article 9 of the UCC.  Doc. 21-1, ¶¶ 36-37.  Consequently, Plaintiffs have calculated their prospective damages under the statute as  the finance charge on the purchase plus 10% of the principal amount of the purchase.  Plaintiffs have alleged a facially plausible claim for recovery under Article 9 of the UCC.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, Country Motors's "Consent Motion to Set Aside Entry of Default" [Doc. 14] is GRANTED.  Pursuant to Federal Rule 55(c) of Civil Procedure, the Court finds "good cause" to set aside entry of default against defendant Country Motors.  Applying the Second Circuit's relevant factors for setting aside entry of default, Country Motors has demonstrated that its default was not wilful.   In particular, Country Motors's immediate retention of counsel upon learning of default  and prompt entry into the case thereafter evidence Country Motors's intention to participate in the action in good faith.   In addition, counsel for Country Motors asserts that her client intends

27

to defend vigorously in this action  (*i.e.*, to present a meritorious defense).  Most importantly, Plaintiffs will suffer no prejudice by the Court's setting aside entry of default at this preliminary stage of the proceedings – especially where Plaintiffs consent to the granting of Country Motors's motion. Accordingly, the entry of default against Country Motors is hereby set aside.  The Clerk is directed to re-insert Country Motors as an active Defendant on the case docket.

Also, Plaintiffs' "Motion For Leave to Amend Complaint" [Doc. 21] is GRANTED in the interests of justice under Rule 15(a)(2), Fed. R. Civ. P.  As Plaintiffs suggest, the proposed "amendment [was] filed within the time parameter set forth in the Joint Rule 26(f) Report of the Parties' Planning Meeting,"  Doc. 21, at 1.  Furthermore, despite expiration of the requisite 21-day period to respond,  Defendants have filed no objection to the motion.  *See*  D. Conn. L. Civ. R. 7(a)(1).

As set forth *supra,* "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  In the case at bar, there is no evidence of undue delay or bad faith.   This is Plaintiffs' first request to amend the complaint, rather than a repeated request.  In addition, having reviewed the claims set forth in the proposed Amended Complaint, the Court finds no reason to believe that allowance of the amendment will either unduly prejudice the Defendants or  be futile in effect.  As to each Defendant, there are multiple claims with facial plausibility under *Iqbal.*  The Amended Complaint thus contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 566 U.S. at 678 (quoting

*Twombly*, 550 U.S. at 570).

Plaintiffs are advised to re-examine and/or edit their Amended Complaint with respect to the viability of certain claims before filing and serving it on Defendants on or before **January 8, 2016.**[19] Defendants shall e-file their answers or responses "within 14 days after service of the amended pleading" or risk default. *See* Fed. R. Civ. P. 15(a)(3). Within fourteen (14) days thereafter, the parties shall once again meet and confer in a parties' planning meeting to ascertain whether there are any necessary changes to be made in their Rule 26(f) Report [Doc. 20]. Within fourteen (14) days following the conference, the parties must file a joint supplemental Rule 26(f) Report, requesting proposed amended deadlines, if any, in light of the Rulings herein and the case's current status.

It is SO ORDERED.

Dated: New Haven, Connecticut
          December 15, 2015

                                        */s/Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

---

[19] *See* nn. 15, 17, *supra*.